UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Jennifer Krueger,

Plaintiff,

v.

Warden L.S. Davis, *in her official capacity*; FCI Waseca Health Services/Medical Department; and Does 1-10, *in their official capacity*,

Defendants.

File No. 26-cv-03811 (ECT/JFD)

**OPINION AND ORDER**

Kyle R. Kroll and Lucas Bowerman, Winthrop & Weinstine, P.A., Minneapolis, MN, for Plaintiff Jennifer Krueger.

Perry Sekus and Sarah Mazzie, United States Attorney's Office, Minneapolis, MN, for Defendants Warden L.S. Davis, FCI Waseca Health Services/Medical Department, and Does 1-10.

Plaintiff Jennifer Krueger is incarcerated at the Federal Correctional Institution in Waseca, Minnesota ("FCI Waseca"). She suffers from severe opioid use disorder. In this case, Ms. Krueger alleges that Defendants have been—and continue to be—deliberately indifferent to her serious medical needs arising from her opioid use disorder, and she claims Defendants' deliberate indifference violates the Eighth Amendment.

Ms. Krueger seeks a preliminary injunction that would, if issued, require Defendants to evaluate Ms. Kruger to determine whether she should be prescribed medication-assisted therapy and, if Defendants determine a prescription is appropriate, administer that

treatment immediately. The motion will be denied. Assuming Ms. Krueger's opioid use disorder is a serious medical need, the better answer on this record is that Defendants have not been deliberately indifferent to it.[1]

I

Ms. Krueger has been incarcerated at FCI Waseca since June 2025. ECF No. 8 ¶ 1; ECF No. 23-2. She suffers from opioid use disorder, or "OUD." ECF No. 8 ¶ 2; ECF No. 22-1. Opioid use disorder may be treated with medication (known as medication assisted therapy or "MAT"), behavioral therapy, or a combination of both. ECF No. 23-1 at 4–5;[2] ECF No. 23 ¶¶ 7–9, 37. Medication is prescribed "to reduce the intensity of urges to use [] opioids," and includes drugs such as methadone, buprenorphine, and naltrexone. ECF No. 23 ¶ 7; ECF No. 23-1 at 28. "While MAT plays an important role in treatment of OUD, behavioral therapy is also important to treating OUD." ECF No. 23 ¶ 9. Behavioral therapy includes "addiction counseling, group therapy, cognitive behavioral therapy, and 12-step programs." *Id.*

FCI Waseca offers a MAT program for inmates. *See* ECF No. 23 ¶¶ 6–17. As of September 8, 2026, FCI Waseca had "300 inmates pending screening for MAT," with "[s]eventy-one inmates . . . currently receiving MAT" and "an additional 15 inmates

---

[1] Ms. Krueger originally pursued this case pro so. Attorneys Kyle R. Kroll and Lucas Bowerman of Winthrop & Weinstine, PA, subsequently appeared on her behalf through the FBA *Pro Se* Project. I acknowledge and very much appreciate Mr. Kroll and Mr. Bowerman's service through the *Pro Se* Project, and thank their firm for supporting their participation in this case.

[2] Page citations are to pagination assigned by the court's CM/ECF system appearing in a document's upper right corner, not to a document's original pagination.

pending a start date after completing the necessary medical evaluation." ECF No. 23 ¶ 15. "When there are a significant number of inmates pending medical assessment, they are prioritized according to medical necessity, i.e., their risk." ECF No. 23 ¶ 12. The Bureau of Prisons (or "BOP") provides opioid use disorder guidance, and FCI Waseca follows the BOP's "recommended prioritization for evaluation." ECF No. 23 ¶ 12. The MAT triage priorities are as follows:

1. Patients who arrive to an institution on medications for OUD treatment.
2. Patients who are pregnant ***and***:
    a. Currently positive for illicit opioid use ***or***
    b. Have a history of OUD treatment ***or***
    c. Have an OUD diagnosis on record ***or***
    d. Have been otherwise identified for OUD evaluation
3. Patients with any use of naloxone in an FBOP institution at any time in the last two years.
    a. Higher prioritization given to those with two or more uses of naloxone within two years.
4. Patients with evidence of active illicit opioid use confirmed by urine drug screen *or* are releasing within the next 90 days with any of the following:
    a. An ICD-10 diagnosis of Opioid Dependence or DSM-V diagnosis of OUD.
    b. Current OUDMSC (OUD Tx Medical Screen Complete), OUDPSC (OUD Tx Psych Screen Complete), or OUDSI (OUD Tx Screening Indicated) administrative code.
5. Referrals (from employees or patients) reporting increased mental health symptoms resulting from imminent, current, or elevated risk for opioid use while incarcerated.
6. Referrals (from employees or patients) indicating prior treatment for OUD or other opioid specific risk factors not listed above.
7. Referrals (from employees or patients), not meeting any of the above criteria and in order of receipt.

ECF No. 23 ¶ 12 (citing ECF No. 23-1 at 22–23). FCI Waseca staff "review the prioritization list weekly," and "[a]s inmates move up on the prioritization list, they undergo a medical assessment to determine clinical appropriateness for MAT." ECF No. 3

¶¶ 13–14. During the medical assessment "[t]he provider . . . considers opioid use history, previous use of Narcan to reverse an overdose, current medications, behavioral health history, and severity symptoms of withdrawal," in addition to ordering "baseline tests." ECF No. 23 ¶ 14. "Mild withdrawal symptoms are not an indication for higher prioritization for MAT. However, the presence of severe withdrawal symptoms indicates the inmate was regularly using high doses of opioids, which in turn indicates she is at higher risk of overdose and death." *Id.* ¶ 8.

In addition to medication therapy, FCI Waseca offers behavioral health programs, including Alcoholics Anonymous, Drug Education, and Non-Residential Drug Abuse. *Id.* ¶ 37. Inmates also "have access to Psychology staff during open house hours three days a week," where they have the option of working with "Drug Treatment Specialists." ECF No. 22 ¶ 10. Inmates may also reach "Psychology staff in an emergency" and need only "alert any staff member they are in crisis" to receive emergency Psychology assistance. *Id.* ¶ 11.

Ms. Krueger received MAT treatment for her opioid use disorder before she arrived at FCI Waseca. *See, e.g.*, ECF No. 9 at 3 (clinical summary from 2017 listing methadone prescription); ECF No. 9 at 14 (clinical summary listing 11/18/2021 buprenorphine 8 mg-naloxone 2 mg prescription); ECF No. 23-4 at 51 (St. Joseph County Jail medical summary dated 9/26/2022 listing suboxone 8/2mg prescription); ECF No. 23-4 at 52 (St. Joseph County Jail medical summary dated 10/07/2024 listing buprenorphine 8mg 2mg prescription); ECF No. 23-4 at 57 (St. Joseph County Jail progress note dated 2/14/2025 listing buprenorphine 8 mg-naloxone 2mg prescription). Ms. Krueger did not, however,

enter FCI Waseca with an active prescription for MAT and was not "enrolled in a medication for opioid use disorder" at the time of her arrival. ECF No. 23 ¶ 19; *see* ECF No. 23-3 at 13–20. At her FCI Waseca intake health screening in June 2025, Ms. Krueger disclosed her past drug use and noted that it had been more than a year but less than five years since her last use. ECF No. 23 ¶ 19; ECF No. 23-3 at 15. Ms. Krueger did not disclose any withdrawal symptoms at this appointment. *See* ECF No. 23-3 at 15.

In addition to her initial medical evaluation, Ms. Krueger underwent a psychology evaluation on July 1, 2025, during which the psychologist learned of Ms. Krueger's prior substance abuse and noted that Ms. Krueger had "[n]o history of substance abuse treatment." ECF No. 22 ¶ 5; ECF No. 22-1 at 5. The psychologist determined that Ms. Krueger "may benefit from participation in drug treatment, due to her reported history of substance abuse." ECF No. 22-1 at 6. On October 28, 2025, Ms. Krueger "participated in a diagnostic and care level formulation interview with a Psychologist." ECF No. 22 ¶ 6; ECF No. 22-1 at 1. At this interview, Ms. Krueger described "withdrawal when not using," "unsuccessful efforts to quit," "cravings," and "continued use in prison (last used unprescribed suboxone approximately 2 days ago)." ECF No. 22-1 at 1. Ms. Krueger was diagnosed with "Opioid Use Disorder, Severe," and the psychologist noted that, with respect to MAT, "there [were] no apparent psychological contraindications that would preclude [Ms. Krueger] from safe participation in the MAT program." *Id.* Ms. Krueger was "referred to Health Services for further evaluation" for the MAT program. *Id.* After the psychologist's referral, Ms. Krueger was placed on the waitlist for a health services MAT evaluation, but she has not yet received this additional evaluation. ECF No. 8 ¶ 12;

*see* ECF No. 23-4 at 65 (explaining that "there are several people ahead of [Ms. Krueger] on the [wait]list").

In two declarations submitted to support her motion, Ms. Krueger testified that she suffers from symptoms she attributes to her opioid use disorder. *See* ECF No. 8 ¶¶ 16, 19–20 (describing "serious physical symptoms," including "nausea, vomiting, diarrhea, stomach distress, severe flu-like symptoms, inability or difficulty eating, inability or difficulty sleeping, and substantial physical discomfort," as well as "seizures during prior periods of withdrawal"); ECF No. 27 ¶¶ 4–10 (explaining that her OUD symptoms are distinct from symptoms associated with her other conditions and that, even with over-the-counter medication, she experiences "serious flu-like symptoms and other effects" as a result of her OUD).[3] Despite describing these severe and ongoing symptoms in her declarations, however, Ms. Krueger does not appear to have regularly reported these symptoms to FCI Waseca health services. Ms. Krueger had two appointments with health services shortly after being transferred to FCI Waseca. At her June 2025 intake appointment, Ms. Krueger did not report experiencing any of the symptoms she describes as resulting from her OUD. ECF No. 23-3 at 13–20; ECF No. 23 ¶ 19. Similarly, at a physical appointment in August 2025, Ms. Krueger reported her last opioid use as more

[3] Ms. Krueger's other medical conditions include anemia and mental health concerns. *See* ECF No. 23 ¶¶ 21, 30 (explaining that a provider "ordered labs to monitor [Ms. Krueger's] anemia" and that a "nurse . . . scheduled [Ms.] Krueger to be seen to discuss mental health concerns since being taken off fluoxetine"). Ms. Krueger takes iron supplements for her anemia and was prescribed fluoxetine for her mental health conditions. *See* ECF No. 23-3 at 5 (listing prescriptions, including ferrous gluconate and docusate sodium for "Iron deficiency anemia" and fluoxetine for "Mental disorder, not otherwise specified").

than one year but less than five years prior, denied seizures, and "denied fever, body aches, chills, nausea, vomiting, muscle aches, headache, dizziness, or weakness." ECF No. 23 ¶ 21; *see* ECF No. 23-3 at 21–35.

At an appointment nearly a year later, in June 2026, Ms. Krueger disclosed withdrawal symptoms. *See* ECF No. 23-4 at 17–24. At this visit, she stated that she was withdrawing and said she was "using suboxone on the compound." *Id.* at 19. Ms. Krueger reported experiencing "chest pain, shortness of breath, restlessness, and restless legs, diarrhea, nausea and feeling hot cold." *Id.* at 19. The medical record from this encounter explains that Ms. Krueger's symptom onset and duration was 3–5 days. *Id.* at 19. The nurse performed a Clinical Opiate Withdrawal Scale ("COWS") assessment and noted that Ms. Krueger scored "(7) mild withdrawal." ECF No. 23 ¶ 29; ECF No. 23-4 at 20, 31. While "[m]edical intervention was not indicated at the time" [ECF No. 23 ¶ 29], Ms. Krueger was "encouraged to use other coping mechanisms such as programing, psychology, exercise, music, religious services, Re-entry, Special Populations, and anything else that may help them" [ECF No. 23-4 at 20].

On July 8, 2026, Ms. Krueger met with health services again and discussed hypertension, headaches, depression, anxiety, difficulty sleeping, chronic pain, and stomach upset due to her iron supplement. ECF No. 23 ¶ 32; ECF No. 23-4 at 4. Ms. Krueger "did not disclose any withdrawal symptoms or concerns about urges related to her

opioid dependence" at this appointment.[4] ECF No. 23 ¶ 32. Ms. Krueger was advised to "work on recovery programming, mindfulness, and exercise." ECF No. 23 ¶ 32; ECF No. 23-4 at 5. Ms. Krueger submitted a sick call request on July 25, 2026, because she "was having trouble falling asleep until 2-6 a.m. due to restless legs and heartburn," which Ms. Krueger "indicated . . . had been going on for about two months." ECF No. 23 ¶ 33. A nurse "scheduled [Ms. Krueger] to be seen by a provider." *Id.*

Although Ms. Krueger does not appear to have regularly reported withdrawal symptoms or opioid urges at healthcare appointments, since being referred for continued evaluation, she has repeatedly requested MAT in messages to FCI Waseca's health services department. *See* ECF No. 23 ¶ 24; ECF No. 23-4 at 63–94 (correspondence between Ms. Krueger and FCI Waseca's health services department). Ms. Krueger has often stated that she needs MAT in these messages, but the messages "did not mention experiencing urges to use illicit opioids or withdrawal symptoms." ECF No. 23 ¶ 24. Ms. Krueger did, however, note that she was having trouble with her addiction. In one message dated November 19, 2025, Ms. Krueger wrote that she was "really struggling with [her] addiction," ECF No. 23-4 at 85, and, in another dated February 7, 2026, Ms. Krueger explained that she was "still desperatly [sic] struggling in [her] addiction," ECF No. 23-4 at 81.

---

4 The medical documentation from this visit includes a note stating that Ms. Krueger has Opioid Dependence - Severe and "is on the waiting list for MAT (was on at her county jail prior to transfer in 2025)." ECF No. 23-4 at 5.

Ms. Krueger claims that Defendants were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment. *See* Compl. [ECF No. 1] ¶¶ 138–153. Ms. Krueger filed this preliminary-injunction motion on August 28, 2026. ECF No. 4. She seeks an order "requir[ing] Defendants to promptly complete any clinical steps; make an individualized medical determination; and, if MAT is clinically indicated and no individualized contraindication exists, initiate clinically appropriate medication treatment without further administrative delay." ECF No. 6 at 3.

II

A

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The Eighth Circuit's familiar *Dataphase* decision describes the list of considerations applied to decide whether to grant preliminary injunctive relief: "(1) the likelihood of the movant's success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm that the relief would cause to the other litigants; and (4) the public interest." *Lexis-Nexis v. Beer*, 41 F. Supp. 2d 950, 956 (D. Minn. 1999) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 112–14 (8th Cir. 1981)). Where "the [g]overnment is the party opposing the preliminary injunction," the third and fourth preliminary injunction factors merge. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Let Them Play MN v. Walz*, 517 F. Supp. 3d 870, 888 (D. Minn. 2021).

Because Ms. Krueger is in prison, the Prison Litigation Reform Act applies. *See* 18 U.S.C. § 3626(g) (defining terms and demonstrating applicability of the Prison Litigation Reform Act). Although the Act allows plaintiffs to seek injunctive relief, the relief in question "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The Act instructs courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief." 18 U.S.C. § 3626(a)(2). "[I]n the prison context, a request for injunctive relief must always be viewed with great caution because 'judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration.'" *Goff v. Harper*, 60 F.3d 518, 520 (8th Cir. 1995) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)).

B

1

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation modified). A movant must show it has a "fair chance of prevailing" on the merits of a claim to obtain a preliminary injunction. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008); *see CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (recognizing that the movant "need only show likelihood of success on the merits on a single cause of action, not every action it asserts"). Under the "fair chance of prevailing" standard, a movant "need not show that it has a greater than fifty per

cent likelihood of success." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016–17 (8th Cir. 2022) (citation modified). "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied." *CDI Energy Servs., Inc. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Under the Eighth Amendment, "[w]hether an official was deliberately indifferent entails both an objective and a subjective analysis," and the application of the standard is a 'factually intensive inquiry.'" *Scott v. Benson*, 742 F.3d 335, 339–40 (8th Cir. 2014) (citation modified). To prove deliberate indifference, a plaintiff "must show that (1) he suffered from objectively serious medical needs, and (2) the defendants actually knew of, but deliberately disregarded, those needs." *Mead v. Palmer,* 794 F.3d 932, 936 (8th Cir. 2015).

A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (quoting *Davis v. Buchanan County*, 11 F.4th 604, 623–24 (8th Cir. 2021)); *accord Mitchell v. St. Louis County*, 160 F.4th 950, 957 (8th Cir. 2025). A "serious medical need" may encompass the timeliness of treatment. *See Presson*, 65 F.4th at 366–67. In other words, in many cases, a serious medical need is defined not merely by a health condition or the need for treatment generally but also by the need for specific treatment to be administered promptly or within a certain period. *See id.* In *Myers v. Hennepin County, Minnesota*, I held that a complaint plausibly alleged that an individual had "serious medical needs" where the individual was diagnosed with schizoaffective disorder, prescribed

antipsychotic medications to treat the disorder, and had been placed under a *Jarvis* order. *Myers v. Hennepin County*, No. 25-cv-2314 (ECT/ECW), 2026 WL 1133708, at *11 (D. Minn. Apr. 27, 2026).

Here, Ms. Krueger's opioid use disorder is a serious medical need. It is undisputed that Ms. Krueger has been diagnosed with this condition. ECF No. 8 ¶ 2. And courts have found that opioid use disorder constitutes a "serious medical need." *See, e.g.*, *Edwards v. Witherspoon*, --- F.4th ---, No. 24-7049, 2026 WL 2661096, at *14 (4th Cir. 2026) (holding that an inmate's "official OUD diagnosis is sufficient to meet [the first prong of the deliberate indifference test]"); *cf. Buckmaster v. S. Dak.*, No. 4:26-CV-04092-KES, 2026 WL 2198909, at *8 (D.S.D. July 30, 2026) (finding that a plaintiff who requested placement in a prison MAT program and who alleged he was diagnosed with "opioid disorder" and suffered from "headaches, dizziness, restless sleep, and high anxiety" had "alleged the existence of a serious medical need" for IFP screening purposes). To be clear, the record does not show that Ms. Krueger has a serious medical need for MAT. She does not say that she does. Her requested injunction begins with an evaluation by a qualified clinician; it includes MAT only "[i]f Defendants conclude that MAT is warranted." ECF No. 6 at 19. And Ms. Krueger did not have a MAT prescription when she entered FCI Waseca. ECF No. 23 ¶ 19.

Answering whether a defendant knew of a serious medical need seems best described as a common-sense, fact-specific inquiry. *See, e.g.*, *Stewart v. Garcia*, 139 F.4th 698, 709–10 (8th Cir. 2025) (identifying several facts from which jury might reasonably find that defendant knew of plaintiff's medical need); *Mitchell*, 160 F.4th at 957

(recognizing that "[a] defendant's actual knowledge may be inferred 'from the very fact that the risk was obvious'" (quoting *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 481–82 (8th Cir. 2008))). Deliberate disregard may be shown through allegations that a defendant failed to respond at all to a detainee's medical needs or provided "'[g]rossly incompetent or inadequate care' where 'the treatment is so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Mitchell*, 160 F.4th at 957 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1240–41 (8th Cir. 1997)). "Mere negligence or medical malpractice . . . are insufficient to rise to a constitutional violation." *Id.* (quoting *Dulany*, 132 F.3d at 1239); *see Smith v. Clarke*, 458 F.3d 720, 724 (8th Cir. 2006) ("Malpractice alone is not actionable under the [E]ighth [A]mendment."). "[D]eliberate indifference 'requires a mental state akin to criminal recklessness.'" *Mitchell*, 160 F.4th at 957 (quoting *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014)); *see Gordon ex rel. Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006) (recognizing that the required mental state is "akin to criminal recklessness: disregarding a known risk to the inmate's health"). "As long as this threshold is not crossed, [detainees] have no constitutional right to receive a particular or requested course of treatment, and . . . doctors remain free to exercise their independent medical judgment." *Dulany*, 132 F.3d at 1239; *see Fourte v. Faulkner County*, 746 F.3d 384, 387 (8th Cir. 2014) (recognizing that "mere disagreement with treatment decisions does not rise to the level of a constitutional violation" (quoting *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000))). The Eighth Circuit has held that "[p]rison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment,

they refuse to implement a prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996).

The better answer on this record is that Ms. Krueger has not shown she is likely to succeed on the merits with respect to the deliberate-indifference prong. FCI Waseca is aware of Ms. Krueger's opioid use disorder and has approved her for MAT evaluation. ECF No. 22-1. But it has also provided Ms. Krueger with medical care when she has requested it. *See* ECF No. 23-4. Ms. Krueger is engaged in prison programming and may work with psychology staff both at regular intervals during the week and in times of emergency. ECF No. 22 ¶¶ 10–11. As far as her FCI Waseca medical records show, Ms. Krueger has not indicated to prison officials that she suffers from opioid use disorder symptoms severe enough to require particular care that she has not received. Though Ms. Krueger spoke about withdrawal and cravings at her psychology services interview in 2025, was diagnosed with "OUD – Severe," and reported withdrawal once in June 2026 (classified as "mild"), the medical records do not indicate that Ms. Krueger reported severe OUD symptoms.

Ms. Krueger was asked about her drug use at health services appointments in June 2025 and August 2025, where she reported that her last use was more than one year but less than five years prior to her appointments. ECF No. 23 ¶ 21. At these appointments in June and August 2025, Ms. Krueger did not disclose any withdrawal symptoms. ECF No. 23-3 at 15. She also "denied fever, body aches, chills, nausea, vomiting, muscle aches, headache, dizziness, or weakness." ECF No. 23 ¶ 21. These are symptoms Ms. Krueger now attributes to her opioid use disorder [ECF No. 8 ¶¶ 16, 19–20; ECF No. 27 ¶¶ 4–10],

but in June and August 2025, she did not inform medical staff that she was experiencing these symptoms at all, much more that she was experiencing them as a result of her opioid dependence. Similarly, although Ms. Krueger has requested MAT repeatedly in messages to FCI Waseca health services and has noted that she is "struggling," Ms. Krueger has not explicitly reported withdrawal symptoms, active use, or opioid urges in these messages, ECF No. 23-4 at 63–94, nor did Ms. Krueger visit health services about these concerns until she believed she was experiencing withdrawal in June 2026.

When Ms. Krueger believed she was experiencing withdrawal in June 2026, health services responded, conducted the COWS assessment, and noted that Ms. Krueger scored "(7) mild withdrawal." ECF No. 23-4 at 20, 31. At this appointment, Ms. Krueger was "encouraged to use other coping mechanisms." ECF No. 23-4 at 20. According to the records provided, Ms. Krueger has reported drug use just one other time, at her psychology services evaluation in October 2025, where the psychologist noted "continued use in prison (last used unprescribed suboxone approximately 2 days ago)." ECF No. 22-1 at 1.

In July 2026, after experiencing withdrawal in June 2026, Ms. Krueger met with health services again and discussed headaches, depression, anxiety, difficulty sleeping, chronic pain, and stomach upset due to her iron supplement. ECF No. 23 ¶ 32; ECF No. 23-4 at 4. While these might conceivably be withdrawal symptoms, Ms. Krueger did not discuss withdrawal or opioid urges at this appointment. ECF No. 23 ¶ 32; ECF No. 23-4.

Ms. Krueger's doctor notes that Ms. Krueger "has diagnosed medical conditions with symptoms she may be attributing to withdrawal symptoms." ECF No. 23 ¶ 39. Ms. Krueger asserts that she has opioid use disorder symptoms, in addition to symptoms from

other conditions. ECF No. 27 ¶¶ 3–10. As explained, however, it does not appear that Ms. Krueger has made health services staff aware of all the symptoms she believes are directly related to her opioid use disorder. The bottom line is that the record does not show that FCI Waseca has failed to respond at all to Ms. Krueger's medical needs or provided grossly incompetent or inadequate care. Ms. Krueger is not likely to succeed on the merits of her Eighth Amendment claim.

2

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To show irreparable harm, 'a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief.'" *Morehouse Enters.*, 78 F.4th at 1017 (quoting *Dakotans for Health v. Noem*, 52 F.4th 381, 392 (8th Cir. 2022)). A plaintiff "must show the harm is 'not merely a possibility' but is likely to occur absent preliminary injunctive relief." *Id.* (quoting *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022)). "Speculative harm does not support a preliminary injunction." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012); *see Berkley Risk Adm'rs Co. v. Accident Fund Holdings, Inc.*, No. 16-cv-2671 (DSD/KMM), 2016 WL 4472943, at *4 (D. Minn. Aug. 24, 2016) ("[A] plaintiff cannot simply establish a risk of irreparable harm. There must be a 'clear showing of immediate irreparable injury.'" (quoting *Internet Inc. v. Tensar Polytechnologies, Inc.*, No. 05-cv-317 (RHK/AJB), 2005 WL 2453170, at *5 (D. Minn. Oct. 3, 2005))). "Failure to show irreparable harm is an

independently sufficient ground upon which to deny a preliminary injunction." *Watkins*, 346 F.3d at 844; *see Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

Ms. Krueger has not demonstrated a risk of irreparable harm. This is so for essentially the same reason she cannot show that Defendants knew of, or deliberately disregarded, a serious medical need beyond her opioid use disorder. Ms. Krueger asserts that she suffers from a variety of symptoms related to her opioid use disorder and fears having a seizure when she experiences withdrawal symptoms. *See* ECF No. 8 ¶¶ 16, 19–20. But Ms. Krueger has reported using opioids only twice, once in June 2026 when she was in "mild withdrawal" and once at her psychology evaluation where she reported "continued use in prison (last used unprescribed suboxone approximately 2 days ago)." ECF No. 23-4 at 19–20; ECF No. 22-1 at 1. She has not spoken with health services staff about her seizure concern, nor has she reported experiencing seizures in the past at health services appointments. *See, e.g.*, ECF No. 23-3 at 21 (noting that Ms. Krueger denied seizures). She has also not reported active withdrawal other than at her June 2026 appointment or reported urges outside of her initial psychology appointment. Ms. Krueger has access to medical care and received prompt medical attention when she reported withdrawal. *See* ECF No. 23 ¶ 29 (noting that "[a] nurse assessed [Ms. Krueger] in the Special Housing Unit" after correctional staff notified medical staff that Ms. Krueger "was complaining of chest pain and shortness of breath").

3

The last two factors to consider are the balance of the relative harms and the public interest. For practical purposes, these factors "merge" when a plaintiff seeks injunctive relief against the government. *Nken*, 556 U.S. at 435; *see Angelica C. v. Immigr. & Customs Enf't*, No. 20-cv-913 (NEB/ECW), 2020 WL 3441461, at *17 (D. Minn. June 5, 2020), *R. & R. adopted*, 2020 WL 3429945 (D. Minn. June 23, 2020). These factors are difficult to assess thoroughly on this record, but I conclude they don't change things. The harm to Ms. Krueger is a delayed assessment. Balanced against that individual harm are institutional consequences for FCI – Waseca. These include the intrusion an injunction would impose on its ability to independently assess and adhere to its inmate triage priority list. This is a significant concern. As Defendants explained, there are 800 inmates housed in FCI Waseca. ECF No. 23 ¶ 15. As of early September 2026, FCI Waseca had 300 inmates pending MAT screening, 71 inmates receiving MAT treatment, and another "15 inmates pending a start date after completing the necessary medical evaluation by a provider." *Id*. These numbers help to highlight that prioritizing and managing a MAT program inside a prison requires the difficult balancing of competing interests and the handling of sensitive inmate safety concerns. Ms. Krueger does not challenge these larger policies.

## ORDER

Therefore, based on the foregoing, and on all the files, records, and proceedings in this case, **IT IS ORDERED THAT** Plaintiff's Motion for Preliminary Injunction [ECF No. 4] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: September 28, 2026

s/ Eric C. Tostrud
Eric C. Tostrud
Chief Judge, United States District Court